Good morning, your honors. May it please the court, I'm Alan Pierce of Hancock Estherbrook and I represent plaintiff appellant Kyle Endemann. The primary issue that overrides this case, although there are some others, is whether or not questions of fact regarding whether Defendant Liberty is a stopped to assert statute of limitations. A side issue of that is what is the statute of limitations for plaintiff's breach of the implied duty of good faith and fair dealing recognized in 2008 by the New York Court of Appeals as against insurance companies in the dual cases. That's an issue that this court will have to do. There's unresolved under New York law this court would have to resolve what you think the New York Court of Appeals would do or you could, of course, certify that issue or any issue. I submit to you here the proof on estoppel is misrepresentation or deception by the defendant. So if I can interrupt you, can you identify with some specificity what you think was the affirmative misrepresentation or deception? I saw a bunch of letters that maybe your client optimistically interpreted, but the standard is affirmative misrepresentation or deception. So what what's the best thing you have that you think shows that? Well, there are several. The best thing I think is the letters right out of the gate by Kim Gunyard on March 3rd of 2014. That's the day she issued the check for $10,500 under the sump pump failure, which, of course, he didn't have a sump pump on the date of the loss. Except that during his deposition, he didn't indicate that she'd been told that. He had his own adjuster show her the place. He did show her the place where the sump pump by that time had been installed. And indeed, he indicated during his deposition testimony that none of the additional damage, the damage to the patio, the damage to the foundation, not been shown to him, not shown to the adjuster. So how is the misrepresentation where she's talking about a claim for a sump pump, a misrepresentation on her? Well, and giving a check for the sump pump is not necessarily the deception. It's what she said in her letters. She's talking about further damage. If you have further damage, submit your materials to us. And he didn't. He didn't. He never did. He didn't. He did. He asked his lawyer in December of 2014 why he hadn't put the insurer on notice. So he knew that the insurer didn't know of the additional claims that he wanted to assert with regard to his coverage. And yet, the lawyer told him, you don't need to do that. That's his testimony. So he himself never did it. He definitely was aware, Mr. Pierce. I mean, he was definitely aware of the fact that they were not on notice of the additional damage. That's correct, your honor. But he didn't know it was a two year limitation period, and in fact, that was- Well, that's his policy, and he's represented. I'm sorry, sir? It's his policy. Yes. One would think, one reads your policy. You know, I remember the ice storm of 1991. I sat there in the morning of March 1991 and heard the tree limbs falling down and I was seriously reading my policy hoping that one of the tree limbs would strike my house. Because if it didn't strike my house, my carrier wouldn't pay for the repair of the trees, taking the trees down. But one reads their policy, and he was represented. He had a lawyer. He had a lawyer that I attested. And for whom you sued for malpractice. Yes, your honor. Yes, and so here, everything Liberty did, from the very moment they handed him the $10,500 check and started communicating with him, everything they did suggested his claim was open. Absolutely not, right? Didn't they actually, on the 14th, decline to subrogate and say that it was going to be closing his file? Yes. Okay, so- Yes, but then they did subrogate, and they constantly told him- But how is subrogating going to help him, right? They said at most that they were going to get back his deductible, which was far less than that. Well, the subrogation isn't the main thing that they did that would be deceptive or misrepresenting. Here, they did, so I'm just saying they did subrogate, and then they constantly told him we're still evaluating their claim. And I know Liberty says, well, when they wrote that, they're talking about the subrogation. But we know from further- Okay, I'm sorry, so it's- They didn't know there was any other claim to make. He didn't tell them. But he did, Your Honor, because Mr. Habe, who's a matrimonial lawyer, in April of 2017, it's in the appendix, they went to Liberty Mutual and said, okay, now we know we've got a whole lot more damages. Then- They're, quote, widening the claim. Yes, and then he said, well, I don't need to widen the claim. He said- Why would he say widening the claim if they had always been, if your client had always been operating on a presumption that the claim equaled all the other damage that he wanted to have Liberty pay for? Well, first of all, he didn't know he had substantially increased damages until 2016. I tried the case against the neighbor. I'm very familiar with this, and our record supports it. Here, they didn't know. So they went to Liberty Mutual after the statute ran. There's a lot that happened before the statute- When did the statute run? What's the end date of the statute? February 21, 2016. Okay, so they don't widen the claim until after the statute's run. Well, we have to remember that on March 6, 2014, a few days after Kim Goonyard was there, he did what she told him in her March 3rd letters to do if you get bills, send them to us for our review. But how is that affirmatively misrepresented? I mean, I understand why your client or anybody else would be hopeful that maybe more money would be coming down to them. But what your burden is to show that they affirmatively misrepresented something. And right now, the best you are offering me, and I'm going to give you another chance, is to say keep sending us more information, let us know if something changes or some version of that. Well, if we go to the heart of it, in June of 2017, he contacted them. He's talked- After it was- Yes, after. There were other things before I started to say. He sent them the service master bill in March of 2014, and he never heard from them. He did what he was told to do. That's not an affirmative representation. Right. So what's the best you have? Is that in June of 2017, there's communications where the lawyer Habe says to Liberty's rep, well, it's a six year statute. He doesn't correct him. I get it. It's not affirmative. If that's the test, your honor- So the best you have is a non-response to- If that's the test, the only better proof on this record would be if Liberty told him he had a six year limitations period. I don't think I've ever seen that in any estoppel case ever. It seems as though that would be the only thing that would be in addition to what they did here to lull him into believing he had a six year limitations period. That's the only thing they could have done. I don't think that's required under New York law. To affirmatively tell somebody, your statute is six years, but it's really two, we're hiding that. There's not an estoppel case that says that. We've got an accumulation of facts here that very clearly show that he was lulled by the statements they made in their letters and on the telephone. And then when he comes to them in June of 2017 and gives them hundreds of pages of his damages, they don't say, by the way, your claim is time barred, we'll take a look at that. And then when they write their first disclaimer letter, June 12 of 2017, they say they reviewed all the information he gave them. Why are they reviewing all of his information? They are because his claim is still open. Kim Goonyard says it is, Heather Campbell Lamont says it is. Their claim file says it's still open. That's the best thing going. They didn't say, your time barred. They went through a whole analysis for the very first time of the other coverage provisions of this policy besides the sump pump failure. They should have done that within the two year statute and told him, we're not paying you another dime. I get it. It's a failure to speak, but there are enough things here to raise a question of fact that are not ginned up, as Judge Heard said. Thank you. A couple of minutes for rebuttal. Yes. Mr. Sheck. Good morning, your honors. Just a few items I want to point out. When Ms. Goonyard was there, she provided a check for $10,500 limits, provided an estimate showing she estimated the damages at approximately $14,000. And that this was over the limit, that his damages were more than the limits of the policy. But we are only paying you the limits of the policy of $10,000 plus the other $500. You have a $1,000 deductible. That's all you're getting. So he knew we viewed his damages as more than his limits. The idea that he did not understand at that moment in March of 2014, when he had an insurance expert, he had a public adjuster handling the claim, he had his uncle who was an attorney, he soon after hired another attorney, he hired another insurance expert, yet he's claiming he relied on us to tell him something that was in his policy that he claims he didn't understand. And we also told him, to the extent that wasn't clear, that we weren't paying him anymore. In April of 2014, we told him, we're closing our file because you've asked us to bring this subrogation claim. Well, we've considered this subrogation claim. We have no chance to win this subrogation claim against the neighbor, so we're closing our file. You can pursue that on your own if you want. The testimony is undisputed at that point. The plaintiff contacted the people at Liberty, was unhappy with this situation, thought that this subrogation action could give him some leverage in his suit against the neighbors. So he asked that the subrogation case be brought, ultimately was successful in getting Liberty to pursue the subrogation. What's your response to your adversary's argument that a non-response can be lulling into inaction? The only thing I heard on that was something in June of 2017, and we have two letters in June of 2017 saying, we're not paying you any money. And here's the reasons why. And the reason there were two letters is because Mr. Enderman was unhappy with the first letter, claimed it was not specific enough. So another letter was sent a week later saying, we are not paying you. Because one, we've paid you the limits of what's covered, and two, the two years has run. There are no more questions. Thank you. Thank you. I can be very brief. Mr. Schaff wants to say what Mr. Enderman knew when he got the $10,500 check. He stated in his affidavit, I didn't know that that was the end. And that's why a few days later he sent a service master bill to Kim Gunyard, the same woman. If he really thought subjectively that his claim was closed, which her letters of March 3rd in the appendix don't say, then he wouldn't be sending more information. In fact, her- But I just want to make sure, the standard isn't whether or not it was reasonable for him to be hopeful. The standard is whether or not they affirmatively misrepresented something. You would agree, right? The cases say misrepresented or deception. I don't see the word affirmative in those cases. And which is why I think here, the court's asking us to have a false statement from Liberty or any party in an estoppel case, an affirmative false statement. I've never seen an estoppel case like that. And we talk about reading the policy and knowing. In this case, the policy is in the supplemental appendix by Liberty. And in fact, it has a one year statute. And then you have to go to the amendatory endorsements to see, under New York law, it has to be two years. The lawyers in my office come to me with insurance policies every week. I don't know what this says. Lawyers. I don't think that's the standard. You haven't said the policy was a misrepresentation. But the problem is, is that a misunderstanding about coverage isn't an affirmative misrepresentation. No, your honor. But, and Mr. Shapp points out that, yeah, they did send letters in June of 17 when it's over. That's because Mr. Enderman gave them all his proof of almost a half a million dollars worth of damages. And somebody woke up at Liberty and said, holy moly, we never sent this guy a coverage letter. A declining, we've got to decline it. He didn't make a claim. He hadn't made a claim, he had not made a claim. He never made a claim at any point in time for the damages that he asserted in June of 2017 after the two year period. He never, I've read his deposition twice. Yes, sir. Yes, sir. And he affirmatively says that he had no contact with Liberty with regard to asking for additional monies at any point in time until June of 2017. He didn't, I think it's- Well, is Liberty supposed to be clairvoyant? Well, no, your honor. To understand that he really does want more money even though he hasn't asked for it? The fact that he asked for subrogation is not a signal that he thinks that he's entitled to more money. What he wants Liberty to do is carry the cudgel for him in the subrogation claim so that it will recover his $10,000. He wants to use it to get additional monies, I understand that. But that doesn't mean that Liberty somehow, that's not some kind of assertion by Liberty that they agree with him that he's entitled to more money under the policy, is it? No, but they kept his claim- I would have thought that if he was going to ask them to subrogate, he'd also say, because you're on the hook for a lot more money from me. But he didn't know that then. He didn't know that then? He didn't know what his full damages were until at least 2016, your honor, after the statute. That's not Liberty's fault. It is not. But it's not his fault that they kept his claim open. And in June of 2017, when he gave them, yes, after the statute for the breach of contract ended, he gave them the additional damages, they reviewed them, they told us in the deposition they reviewed them. Why are they reviewing things- What's your best page in the appendix of his testimony that says that the misrepresentations that lulled him into believing that they were keeping his claim open? I don't, well he wasn't asked that question by Mr. Schiff. He was asked that question, he said he had no contact with Liberty from the time after he heard, got the letters with regard to the sum of the claim until sometime in June of 2017. I would acknowledge, your honor, that from August and September of 2014 until 2017, he's not having direct contact that he initiated. Then where did the representations from Liberty come from? It's in all these documents that I've highlighted in my brief. Okay, okay. Thank you, thank you, your honor. We'll take the case under advisement.